Filed 3/13/24  Herrera v. Centre for Neuro Skills CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| PRISCILLA HERRERA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CENTRE FOR NEURO SKILLS et al.,<br><br>Defendants and Appellants. | F085587<br><br>(Super. Ct. No. BCV-22-101922)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Belden Blaine Raytis, T. Scott Belden and Kaleb L. Judy for Defendants and Appellants.

Protection Law Group, Heather Davis, Amir Nayebdadash, Carlos Jimenez, and Jeffrey Jimenez for Plaintiff and Respondent.

-ooOoo-

Defendants Centre for Neuro Skills (CNS), CFN Services, Inc., and CFN Services, Inc., California appeal from a December 16, 2022 order of the Kern County Superior Court denying their motion to compel arbitration. For reasons set forth below, we affirm the order.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Priscilla Herrera worked for CNS as a "Neuro Rehab Specialist" between June 2016 and September 2021. In August 2022, Herrera filed a class action complaint against defendants alleging various Labor Code violations.

On November 7, 2022, defendants concurrently filed a motion to compel arbitration and a declaration of Laura Bennett—CNS's "Associate Vice President, Human Resources"—in support thereof. In said declaration, Bennett averred in part:

"3. As part of my duties, I oversee CNS's HR department. I also participate with other CNS management employees in decisions regarding employees, clients, suppliers, and insurers. As such I have personal knowledge as to each fact in this declaration. [¶] . . . [¶]

"22. CNS, as an employer, kept a personnel file for Plaintiff Priscilla Herrera. The personnel files consist of documents made in the regular course of CNS's business, like employee applications, write-ups, and documents noting the dates of hiring or terminating an employee. These documents are all made when the event actually happened. For example, when an employee is terminated the document noting that would generally be prepared the same day. I am one of the custodians of records for CNS. [¶] . . . [¶]

"24. [A] CNS employee's new-hire paperwork is a combination of paper documents and online forms. A lot of CNS's application, hiring, and training process is done online.

"25. I have reviewed Ms. Herrera's personnel file. Her personnel file looks essentially like every other CNS employee's personnel file, and contains the same basic documents. Nothing about her personnel file would lead me to believe that the documents in it are inaccurate or unreliable. [¶] . . . [¶]

2.

"26.     CNS's employee training is a combination of online and hands-on training.  Online training is done through CNS's learning management system.  At the time, this was a cloud-based service called 'MyNetLearning' by Healthcare Source.  Employees can access this service via a website, or can login from their ADP page.

"27.     During Ms. Herrera's employment, CNS used ADP's 'WorkforceNow' online system for certain HR services, including employee time-tracking, payroll, and employee tax reporting.  Because we rely on ADP for all of these tasks, it is very important to CNS that the ADP system be secure and trustworthy.  CNS trusts ADP's systems in general, and its collection of employee electronic signatures in particular, because ADP is a well-known S&P 500 company that is a leader in employee data security.

"28.     ADP does not provide CNS with an applicant or employee's WorkforceNow credentials.  ADP does not provide CNS with applicant/employee WorkforceNow passwords.  [¶] . . . [¶]

"32.     On June 17, 2016, Ms. Herrera logged in to CNS's MyNetLearning online portal.

"33.     Employee login credentials to MyNetLearning are automatically generated by ADP shortly after the employee is hired.  The employee then receives an email prompting them to log-in to MyNetLearning, or can log in through their ADP profile.  Employees can log-in using their personal email address or their CNS badge number.

"34.     During the first log-in, the employee must choose a unique password.  Only the employee knows their unique password (unless they choose to share it with another person).  CNS HR and IT do not ask employees for these passwords and advise employees not to share their passwords with anyone.

"35.     Once an employee logs in to MyNetLearning, they see a dashboard that includes a 'to do list' that shows the training modules that employee needs to complete, the documents they need to review, and the associated tests they need to take.

"36.     All CNS employees, even management-level employees like me, are required to use MyNetLearning to access CNS training courses.  Some trainings are done on hire, others are done periodically, and some are designed to advance employees' understanding of rehabilitation to qualify them for raises or promotions.

3.

"37.    Shortly after hire, new employees will do a series of trainings through MyNetLearning on CNS's general policies, including the employee handbook, patient privacy, diversity, and safety.

"38.    One of the periodic trainings is to review that year's employee handbook, and then take an online test regarding certain contents of the handbook. CNS generally updates its handbook on a yearly basis.

"39.    MyNetLearning can generate a transcript for each employee, showing what MyNetLearning courses the employee has completed, and the grade the employee received on the associated test. A true and correct copy of Ms. Herrera's transcript is attached hereto as **Exhibit C**. Ms. Herrera's transcript is consistent with the training all Neuro Rehab Specialist employees are required to do, and I believe it is reliable and accurate.

"40.    Pursuant to Ms. Herrera's MyNetLearning transcript, on June 17, 2016, (the week after she was hired) she completed multiple training modules, including 'CNS Employee Handbook-CA.16' i.e. CNS's 2016 employee handbook.

"41.    A true and correct copy of CNS's 2016 employee handbook is attached hereto as **Exhibit D**. The 2016 employee handbook contained a section titled 'Arbitration Agreement' on pages 67 and 68.

"42.    To complete the 'CNS Employee Handbook-CA.16' training course, each employee had to take a test. A true and correct copy of the test questions and possible answers is attached hereto as **Exhibit E**.

"43.    Ms. Herrera scored 100% on the test for this training course. Thus, she answered 'yes' to question 7, i.e. she answered 'yes' when presented with the statement 'I acknowledge and agree that this Handbook contains an arbitration provision and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.'

"44.    To progress through each test, the employee will select an answer to the question, then click 'next question'. At the end, the employee will click a button labelled 'grade test'. At that point the employee can review their test results. An employee can re-take a test if they do not pass. However, an employee (or administrator) cannot change test results; the MyNetLearning transcript would reflect that the test had been re-taken.

4.

"45.     Again, I have to go through this process myself, so I know exactly what Ms. Herrera would have had to do.  Additionally, I have administrator level access to CNS's MyNetLearning system.  Every employee is presented with a test regarding the CNS handbook every time it is updated.

"46.     CNS did not update the employee handbook in 2017.  However, throughout 2017 Ms. Herrera continued to periodically log-in to MyNetLearning to complete other CNS training courses.

"47.     In 2018, CNS updated the employee handbook.  Ms. Herrera completed the training course on the 2018 employee handbook on September 9, 2018, along with other CNS training courses. . . .  A true and correct copy of CNS's 2018 employee handbook is attached hereto as **Exhibit F**.

"48.     To complete the 'CNS Employee Handbook-CA.18' training course, each employee had to take a test.  A true and correct copy of the test questions and possible answers is attached hereto as **Exhibit G**.

"49.     Ms. Herrera scored 100% on the test for this training module.  Thus, she answered 'yes' to question 8, i.e. she answered 'yes' when presented with the statement 'I acknowledge and agree that this Handbook contains an Arbitration Agreement and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.'

"50.     Throughout 2018 Ms. Herrera continued to log-in to MyNetLearning to complete required CNS trainings, as well as the CNS training she needed to promote to a 'Senior Rehabilitation Technician' position.

"51.     In mid-2019, CNS again updated the employee handbook.  Ms. Herrera completed the training course on the 2019 employee handbook on September 28, 2019. . . .  A true and correct copy of CNS's 2019 employee handbook is attached hereto as **Exhibit H**.

"52.     To complete the 'CNS Employee Handbook-CA.19' training course, each employee had to take a test using MyNetLearning.  A true and correct copy of the test questions and possible answers is attached hereto as **Exhibit I**.

"53.     Ms. Herrera scored 100% on the test for this training course.  Thus, she answered 'yes' to question 8, i.e. she answered 'yes' when

5.

presented with the statement 'I acknowledge and agree that this Handbook contains an Arbitration Agreement and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.'

"54.    In mid-2020, CNS again updated the employee handbook. Ms. Herrera completed the MyNetLearning training course on the 2020 employee handbook on September 16, 2020. . . .  A true and correct copy of CNS's 2020 employee handbook is attached hereto as **Exhibit J**.

"55.    To complete the 'CNS Employee Handbook-CA.20' training course, each employee had to take a test using MyNetLearning.  A true and correct copy of the test questions and possible answers is attached hereto as **Exhibit K**.

"56.    Ms. Herrera scored 100% on the test for this training course. Thus, she answered 'yes' to question 8, i.e. she answered 'yes' when presented with the statement 'I acknowledge and agree that this Handbook contains an Arbitration Agreement and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.'

"57.    Altogether, Ms. Herrera electronically agreed to submit any disputes arising out of her employment to binding arbitration on four separate occasions using MyNetLearning.

"58.    Ms. Herrera did not opt-out of any of the arbitration agreements.

"59.    Accepting the arbitration agreement is not a condition of employment with CNS.  The opt-out provision is in place so that employees who do not want to be bound by the arbitration agreement can in-fact opt out.  At least one employee that I can think of has done so, and CNS has not taken any retaliatory actions against that person."  (Fn. omitted.)

Exhibit C of Bennett's declaration was a 14-page document titled "**Transcript  [¶] Centre for Neuro Skills**."  At the top of the first 13 pages were CNS's logo and the following information:  "Learner Name:  Herrera, Priscilla"; "EmployeeID:  5GREKBQFQ"; and "Badge Number:  000101558."  The footer of each page read: "© 1998-2022.  HealthcareSource HR, Inc.  All Rights Reserved."  According to this document, between June 17, 2017, and September 7, 2021, Herrera took 379 courses.  In

particular, she earned a "Grade" of "100" in "CNS Employee Handbook-CA.16" (taken on June 17, 2016); "CNS Employee Handbook-CA.18" (taken on September 9, 2018); "CNS Employee Handbook-CA.19" (taken on September 28, 2019); and "CNS Employee Handbook-CA.20" (taken on September 16, 2020).

Exhibits D, F, H, and J of Bennett's declaration were CNS's October 2016 employee handbook, July 2018 employee handbook, June 2019 employee handbook, and August 2020 employee handbook, respectively. Each version contained an "**Arbitration Agreement**," which provided the following terms (among others): (1) with limited exceptions, "[t]his Arbitration Agreement shall apply to any claim or dispute (including claims that may be accrued but not yet asserted) regarding or arising out of the employee's employment with Company or termination/separation from employment"; (2) "Employee and Company agree to submit any Claims to binding arbitration pursuant to the provisions of the Federal Arbitration Act 9 U.S.C. Section 1, et seq., if applicable, or the provisions of Title 9 of Part III of the California Code of Civil Procedure, commencing at Section 1280 et seq. or any successor or replacement statutes if the Federal Arbitration Act does not apply to employee's employment"; and (3) with limited exceptions, "Employee and Company agree that arbitration shall be the exclusive forum for resolving all Claims."

In addition, each version of the handbook contained a "HANDBOOK RECEIPT AND ACKNOWLEDGMENT" form, which read in part:

> "I acknowledge that I have received and will read the [CNS] Employee Handbook within seven (7) days of my receipt of it, and I will become familiar with its terms. I agree that if I do not understand or agree with any provision of the handbook, I will discuss the provision with my supervisor or a member of the Human Resources Department within ten (10) days from the signing of this acknowledgment. I agree that it is not a binding contract, but a set of guidelines for the implementation of personnel policies. I understand that CNS may modify any of the provisions of the handbook at any time."

7.

"I acknowledge and agree that this Handbook contains an **Arbitration Agreement** and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.  An Employee may submit a form stating that the Employee wishes to opt out and not be subject to the Arbitration Agreement.  The Employee must submit a signed and dated 'Dispute Resolution Agreement Opt-Out Form' that can be obtained from the Company's HR Department . . . .  In order to be effective, the signed and dated Opt-Out Form must be returned to Company within 30 days of the Employee's receipt of this Agreement. . . .  Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company.  An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement."[1, 2]

Exhibits E, G, I, and K of Bennett's declaration were "**Questions, Answers, and Results  [¶]  Centre for Neuro Skills**" for the "CNS Employee Handook-CA.16" test, "CNS Employee Handook-CA.18" test, "CNS Employee Handook-CA.19" test, and "CNS Employee Handook-CA.20" test, respectively.  The footer of each page read: "© 2022 symplr.  All rights reserved."[3]  Question 7 of the "CNS Employee Handook-CA.16" test read in part:

> "Question:  . . .  [¶] . . . [¶]  I acknowledge and agree that this Handbook contains an arbitration provision and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.  [¶] . . . [¶]

---

[1] The July 2018, June 2019, and August 2020 versions added the following language:

"Any employee who has previously signed and accepted any previous version of the Company's Arbitration provision will be bound by that prior version if the employee elects to 'opt out' of this current version."

[2] At the bottom of the form are blank lines for "Employee Signature," "Print Name," and "Date."

[3] In her declaration, Bennett averred MyNetLearning was "recent[ly] renamed 'Symplr', but the processes are the same."

"Possible answers:  (correct marked with ***)

     "1:  Yes *** . . . .

     "2:  No . . . ."

Question 8 of the "CNS Employee Handbook-CA.18," "CNS Employee Handook-CA.19," and "CNS Employee Handook-CA.20" tests read:

     "Question:  I acknowledge and agree that this Handbook contains an Arbitration Agreement and I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook.  An Employee may submit a form stating that the Employee wishes to opt out and not be subject to the Arbitration Agreement.  The Employee must submit a signed and dated 'Dispute Resolution Agreement Opt-Out Form' that can be obtained from the Company's HR Department . . . .  In order to be effective, the signed and dated Opt-Out Form must be returned to Company within 30 days of the Employee's receipt of this Agreement. . . .  Should an Employee not opt out of this Agreement within 30 days of the Employee's receipt of this Agreement, continuing the Employee's employment constitutes mutual acceptance of the terms of this Agreement by Employee and the Company.  An Employee has the right to consult with counsel of the Employee's choice concerning this Agreement.  NOTE:  Any employee who has previously signed and accepted any previous version of the Company's Arbitration provision will be bound by that prior version if the employee elects to 'opt out' of this current version.

     "Possible answers:  (correct marked with ***)

     "1:  True *** . . . .

     "2:  False . . . ."

On December 2, 2022, Herrera filed her opposition to defendants' motion. Among other things, she argued the motion must be denied because defendants "failed to meet their burden in establishing any agreement whatsoever was entered by the Parties." Herrera asserted:

"By simply answering 'yes' to an employee handbook test, on questions about the employee handbook containing an arbitration provision, without providing any proof of any type of signature, written or electronic, much less any verification of such signature, is insufficient to compel the case to arbitration."[4]

In an accompanying declaration, Herrera averred in part:

"3. I do not recall ever receiving a copy of the Employee Handbook. Nor did I ever sign an acknowledgement that I received the Employee Handbook.

"4. I do not recall ever receiving an arbitration agreement with CNS, nor do I recall ever consenting to be bound by any arbitration agreement.

"5. At no point during my employment with CNS, did anyone tell me anything about an arbitration agreement or that I was waiving away any rights, including my rights for a jury trial.

"6. At no time during my employment with CNS was I told that I could negotiate the terms of any of the documents in the employee handbook, including any arbitration agreement.

"7. At no time during my employment with CNS was I told that I could opt-out of the arbitration agreement.

"8. At no time during my employment with CNS, do I recall agreeing to arbitrate my claims against Defendants or waive my right to a jury trial.

"9. During my employment with CNS, I was never given time to review, nor the opportunity to opt-out of any arbitration agreement.

"10. I do not recall any contents of the training quizzes on the employee handbook. Also, I do not recall ever reading the quiz questions regarding the arbitration agreement in the handbook.

"11. I was surprised to hear that CNS claims I agreed to an agreement that binds me to arbitration by answering 'yes' to certain training quiz questions. I did not understand what the term 'arbitration'

---

[4] Herrera filed objections to Bennett's declaration, but the record does not indicate the court ruled on them.

meant at the time I was required to complete the training quizzes and I do not recall this term being mentioned or explained to me by anyone representing CNS during my employment.

"12. No employee or representative of CNS told me that I could hold off on answering any of the quiz questions until after I consulted with an attorney.

"13. No employee or representative of CNS told me that I could hold off on answering any of the quiz questions until after I reviewed or understood all of the questions.

"14. No employee or representative of CNS told me that it was permissible to answer any of the training questions 'incorrectly.' In fact, it was my understanding that I was required to score 100% on the quizzes in order to maintain my employment with Defendant.

"15. If I had understood what an arbitration agreement was and that I was being asked to agree to one, then I would not have answered 'yes' to those quiz questions. If I had been told that there was an opt-out procedure available, then I would have completed the opt-out form."

On December 8, 2022, defendants filed their reply to Herrera's opposition. Among other things, they argued Herrera "electronically agreed that she would be bound by the arbitration agreement contained in the 2016, 2018, 2019, and 2020 employee handbooks" and "did not opt out of any of these . . . Arbitration Agreements." Defendants added:

"[A]lthough Ms. Herrera states that she does not remember the Arbitration Agreements [citation], she pointedly avoids challenging CNS's evidence that she used a unique login and password to regularly acknowledge documents via the MyNetLearning program. Instead, she implicitly admits she took the quizzes and answered the questions, although she no longer recalls the content of those quizzes. [Citation.]

"● Ms. Herrera does not deny that she received MyNetLearning credentials while she worked at CNS;

"● Ms. Herrera does not deny that during the four years she worked for CNS she repeatedly logged in to MyNetLearning to complete CNS training modules.

11.

"● Ms. Herrera does not claim that she ever shared her MyNetLearning password with anyone else.

"● Ms. Herrera does not deny that she completed the training module on the various CNS employee handbooks, and that she always answered 'yes' when presented with the statement 'I agree that my employment, and any disputes arising out of that employment shall be resolved by binding arbitration as provided in this Handbook. . .' She simply claims she did not understand what she was answering 'yes' to. [Citation.]

"● Ms. Herrera does not claim that she opted out of any of the Arbitration Agreements, she simply claims that if someone had explained it to her she would have opted out. [Citation.] Again, this implicitly admits that she answered 'yes' to the questions at issue, and did not opt out.

"Pursuant to California Civil Code §1633.9, any 'act' of Ms. Herrera is sufficient to constitute an electronic signature, and CNS can show in any manner that an electronic record was her 'act'. CNS's declarant meticulously laid out the foundation as to how Ms. Herrera (and only Ms. Herrera) on four separate occasions 'acted' to agree to the Arbitration Agreement. As set forth above, Ms. Herrera has submitted *no* evidence showing these electronic records were not her 'act', other than her statement that—several years later—she does not specifically remember doing it. . . ."

A hearing was held on December 15, 2022. At the outset, the superior court indicated its tentative ruling was to deny the motion because defendants "failed to demonstrate the existence of an executed arbitration agreement." Defendants' attorney maintained:

"The plaintiff here on four separate occasions electronically acknowledged her employment and disputes arising out of it would be governed by an arbitration agreement, and . . . she hasn't disputed that she did that. She's disputed the effects. She's disputed that she didn't understand what she was doing. She's disputed that no one explained it to her, but she hasn't disputed that she electronically clicked on the question that said yes, do you agree to this. And the last three times she did that in 2018, 2019 and 2020, it explicitly gave her the option to opt out of that. It told her the process to go through if she wanted to opt out of that and, as our declarant submitted, avail herself of that opportunity.

12.

"The exhibit we submitted with her transcript of all her trainings that she took while she was at CNS indicated that she routinely used this process throughout the four years she worked there. It was something very routine. This is how most of her training was conducted, was online on her own time, and simply because it was online, it doesn't lessen its ability to be a binding contract. Under California law we just have to show that it was her act, and any act of hers would be sufficient to constitute an electronic signature for California law.

"So simply by clicking yes – since we have shown that she was the one who clicked yes, and she very pointedly does not deny that she was the one who clicked yes on . . . the statement 'I acknowledge and agree the handbook contains an arbitration agreement,' et cetera, et cetera, under California law on the electronic signatures that is sufficient, binding signature, binding agreement."

Herrera's attorney countered:

"There's just no unique identifier that links the test where my client purported acknowledge/acceptance of the arbitration agreement to plaintiff. That's the – that's the long and the short of it."

The court agreed with Herrera's attorney and denied the motion. An "ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION" was filed December 16, 2022. (Boldface omitted.)

Defendants appealed. (Code Civ. Proc., § 1294, subd. (a) [order denying request to compel arbitration is appealable].) In February 2023, defendants' attorney filed a civil case information statement on mandatory Judicial Council form APP-004. Item 2 of Part II of the form includes a box followed by "This appeal is entitled to calendar preference/priority on appeal (*cite authority*)." Defendants' attorney left the item blank. (See Cal. Rules of Court, rule 8.100(g) [appellant must serve and file a *completed* form APP-004].) A completed form would have a marked box and a cite to Code of Civil Procedure section 1291.2. Under that section, "[a]rbitration proceedings are entitled to calendar preference in all courts." (*Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 204, fn. 4; see *Hedges v. Carrigan* (2004) 117 Cal.App.4th 578, 582.) In April, June and November of 2023, defendants' attorney filed applications for

13.

extension of time to file brief stating: "(6) This case is not entitled to priority." The statements contradict Code of Civil Procedure section 1291.2, which makes preference mandatory. (See Bus. & Prof. Code, § 6068, subd. (d) [attorney's duty regarding false statements of fact or law]; Rules Prof. Conduct, rule 3.3(a)(1) [duty of candor].)

In December 2023, defendants' reply brief was filed and, as a result, this appeal was fully briefed. In January 2024, this court notified the parties that, if not requested, oral argument would be deemed waived. Both sides requested argument. In February 2024, we notified the parties that oral argument was set for March 7, 2024.

## DISCUSSION

### I.      Motion to compel arbitration

Generally, "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ." (Code Civ. Proc., § 1281.2.) "Thus, when presented with a motion to compel arbitration, the court's first task is to determine whether the parties have entered into an agreement to arbitrate their claims." (*Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 685; see *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972 ["[T]he trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination."].) "Courts 'apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute.' [Citation.] 'General contract law principles include that "[t]he basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contract[]." ' [Citation.] 'Contract law also requires the parties agree to the same thing in the same sense.' [Citation.]" (*Ramos v. Westlake Services LLC*, *supra*, at p. 685.)

14.

"The burden of persuasion is always on the moving party to prove the existence of an arbitration agreement with the opposing party by a preponderance of the evidence" (*Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 164 (*Gamboa*)), but "the burden of production may shift in a three-step process" (*id.* at p. 165).  "First, the moving party bears the burden of producing 'prima facie evidence of a written agreement to arbitrate the controversy.' " (*Ibid.*, quoting *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)  "If the moving party meets its initial prima facie burden and the opposing party does not dispute the existence of the arbitration agreement, then nothing more is required for the moving party to meet its burden of persuasion." (*Gamboa*, *supra*, at p. 165.)  "If the moving party meets its initial prima facie burden and the opposing party disputes the agreement, then in the second step, the opposing party bears the burden of producing evidence to challenge the authenticity of the agreement." (*Ibid.*)  "If the opposing party meets its burden of producing evidence, then in the third step, the moving party must establish with admissible evidence a valid arbitration agreement between the parties." (*Ibid.*)  "There is a strong public policy favoring contractual arbitration, but that policy does not extend to parties who have not agreed to arbitrate." (*Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 787.)

## II.    Standard of review

" ' " 'There is no uniform standard of review for evaluating an order denying a motion to compel arbitration.' " ' [Citation.]" (*Gamboa*, *supra*, 72 Cal.App.5th at p. 166.)

"We review an order denying a petition to compel arbitration for abuse of discretion unless a pure question of law is presented.  In that case, the order is reviewed de novo." (*Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1056–1057; see, e.g., *Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 755–756 ["As to the existence of an agreement [to arbitrate], we review de novo the trial court's ruling that plaintiffs' evidence was sufficient to create a factual dispute

15.

shifting the burden of production back to [movant]."]; *Espejo v. Southern California Permanente Medical Group*, *supra*, at pp. 1056–1057, 1060 [whether movant's evidence satisfies initial burden of production presents legal question subject to de novo review].)

"Where the trial court's ruling is based on a finding of fact, we review the decision for substantial evidence. [Citations.] Under this deferential standard, ' "[A]ll factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment." ' [Citations.]" (*Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1121 (*Trinity*).)

"When . . . the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the question for the reviewing court is whether that finding is erroneous as a matter of law. [Citations.] ' "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.['] " ' [Citations.]" (*Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066–1067 (*Fabian*).) "For this reason, ' "[w]here . . . the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor. That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." ' [Citation.] [']The appellate court cannot substitute its factual determinations for those of the trial court; it must view all factual matters most favorably to the prevailing party and in support of the judgment. [Citation.] " 'All conflicts, therefore, must be resolved in favor of the respondent.' [Citation.]" [Citation.]' [Citation.]" (*Id.* at p. 1067.)

16.

## III. Analysis

On appeal, defendants ask us to "reverse the trial court's decision to deny their motion to compel arbitration." They opine—and we agree—"the trial court's remarks at the hearing shed little light on whether it was denying the motion on the grounds that [they] failed to meet [their] initial burden" "or whether it felt that Ms. Herrera had shifted the burden back to [defendants] with her declaration." For her part, Herrera believes the court found defendants' evidence was insufficient to shift the burden of production.

Defendants make three contentions. First, they "met [their] initial burden to establish the existence of an agreement to arbitrate." Second, Herrera "did not offer sufficient admissible evidence to create a factual dispute regarding whether she agreed to arbitrate claims against CNS." Third, defendants "met [their] ultimate burden to establish that Ms. Herrera agreed to arbitrate her claims against CNS."

a. *Defendants satisfied their initial burden of production.*

Defendants filed a motion to compel arbitration and Bennett's declaration. Attached to the declaration were four versions of CNS's employee handbooks, all of which contained an arbitration agreement as well as a form acknowledging receipt of the handbook, acknowledging the handbook's contents included the arbitration agreement, and agreeing to submit employment-related disputes to binding arbitration. (See Cal. Rules of Court, rule 3.1330 [petition to compel arbitration must either state verbatim arbitration provisions of written contract or include physical or electronic copy of said contract].)

None of the provided handbooks or forms were signed—manually, electronically, or otherwise—by anyone, let alone Herrera. (Cf. *Fabian*, *supra*, 42 Cal.App.5th at pp. 1064–1065 [contract purportedly bore employee's electronic signature and initials].) While "[t]he party seeking arbitration can meet its initial burden by attaching to the petition a copy of the arbitration agreement purporting to bear the respondent's signature" (*Bannister v. Marinidence Opco, LLC* (2021) 64 Cal.App.5th 541, 543–544), the lack of

17.

a signed agreement is not necessarily fatal at this stage. A party's signature may evince that party's acceptance of an agreement (see *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 ["A party's acceptance of an agreement to arbitrate may be express, as where a party signs the agreement."]), but it is not the exclusive means of proof. (See, e.g., *ibid.* ["A signed agreement is not necessary, however, and a party's acceptance may be implied in fact [citation] or be effectuated by delegated consent."].)[5] Here, to establish Herrera's acceptance, defendants relied upon documentation purporting to show (1) during the course of her employment, Herrera took four online courses testing her knowledge of the employee manual; (2) one of the test questions expressly asked Herrera to acknowledge the handbook's contents included the arbitration agreement and agree to submit employment-related disputes to binding arbitration; (3) in three versions of the aforementioned test question, Herrera was advised about the opt-out procedure and—should she fail to adhere to said procedure—her continuing employment constituted acceptance of the arbitration agreement; and (4) by selecting "Yes" or "True" in response to the question, Herrera assented. (See *Gamboa*, *supra*, 72 Cal.App.5th at p. 165 ["For this step, 'it is not necessary to follow the normal procedures of document authentication.' "].) Defendants produced prima facie evidence of an arbitration agreement.

   b.  *Herrera satisfied her burden of production.*

   In a declaration accompanying her opposition to defendants' motion, Herrera averred she did not recall (1) "ever receiving a copy of the Employee Handbook"; (2) "ever receiving an arbitration agreement with CNS"; (3) "ever consenting to be bound

---

   [5] As mentioned, at the December 15, 2022 hearing, the superior court indicated its tentative ruling was to deny defendants' motion because they "failed to demonstrate the existence of an *executed* arbitration agreement." (Italics added.) Thus, to the extent the court believed arbitration cannot be compelled absent a signed agreement, it was mistaken.

by any arbitration agreement"; (4) "agreeing to arbitrate [her] claims against Defendants or waive [her] right to a jury trial"; (5) "any contents of the training quizzes on the employee handbook"; and (6) "ever reading the quiz questions regarding the arbitration agreement in the handbook."  She added "[i]f [she] had understood what an arbitration agreement was and that [she] was being asked to agree to one, then [she] would not have answered 'yes' to those quiz questions" and "[i]f [she] had been told that there was an opt-out procedure available, then [she] would have completed the opt-out-form."  This testimony sufficiently challenged the notion she accepted the agreement to arbitrate.  (See *Trinity*, *supra*, 78 Cal.App.5th at pp. 1124–1125 ["[I]n the absence of a signed agreement (either handwritten or electronic), [opposing party]'s testimony that she did not recall agreeing to arbitrate by electronically clicking a 'Done' box, coupled with her declaration that she would not have accepted the job . . . had she known of the arbitration clause . . . , was sufficient to carry her burden in opposing a motion to compel."  (fn. omitted)]; see also *Gamboa*, *supra*, 72 Cal.App.5th at p. 167 [the plaintiff "likewise met her burden on the second step by filing an opposing declaration, saying she did not recall the agreement and would not have signed it if she had been aware of it"].)

    c.   *The evidence did not compel a finding in defendants' favor as a matter of law.*

As noted, defendants alleged Herrera accepted the agreement to arbitrate because—on four separate occasions—she answered "Yes" or True" to an online test question asking her to acknowledge such an agreement was contained in the employee handbook and to agree to submit employment-related disputes to binding arbitration. Because Herrera declared she could not recall this question, defendants "had the burden of proving by a preponderance of the evidence that the electronic signature was authentic [citation], that is, it was what [defendants] claimed it was:  'the act of' [Herrera]."  (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 846 (*Ruiz*).)

19.

"[A]ny writing must be authenticated before the writing, or secondary evidence of its content, may be received in evidence." (*Ruiz*, *supra*, 232 Cal.App.4th at p. 843.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) "An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." (Civ. Code, § 1633.9, subd. (a).)

In her declaration supporting the motion to compel arbitration, Bennett averred Herrera "electronically agreed to submit any disputes arising out of her employment to binding arbitration on four separate occasions using MyNetLearning." MyNetLearning was a "cloud-based service" that all CNS employees must access to complete online training courses (e.g., periodic employee handbook tests). To access MyNetLearning, employees would either visit MyNetLearning's website or "login from their ADP [WorkforceNow] page." WorkforceNow was CNS's "online system for certain HR services" that "automatically generated" "[e]mployee login credentials to MyNetLearning" "shortly after the employee is hired." "During the first log-in, the employee must choose a unique password." CNS was not given employees' WorkforceNow credentials or passwords and "advise[d] employees not to share their passwords with anyone." (See *Trinity*, *supra*, 78 Cal.App.5th at p. 1116 [employees logged into website using unique username and password to " 'specifically acknowledge their agreement to be bound by' " handbook's arbitration provision " 'by marking the box next to "acknowledgment," and then affirmatively clicking "Done" ' "]; *Ruiz*, *supra*, 232 Cal.App.4th at p. 844 ["[E]ach employee is required to log into the company's HR

system, using his or her 'unique login ID and password,' to review and sign the employee acknowledgment form."].)

According to Bennett, MyNetLearning "can generate a transcript for each employee, showing what MyNetLearning courses the employee has completed, and the grade the employee received on the associated test." Exhibit C of her declaration was a 14-page document titled "**Transcript [¶] Centre for Neuro Skills**," which: (1) bore "Learner Name: Herrera, Priscilla"; "EmployeeID: 5GREKBQFQ"; and "Badge Number: 000101558"; and (2) indicated "Herrera, Priscilla" earned a "Grade" of "100" in "CNS Employee Handbook-CA.16" (taken on June 17, 2016); "CNS Employee Handbook-CA.18" (taken on Sept. 9, 2018); "CNS Employee Handbook-CA.19" (taken on Sept. 28, 2019); and "CNS Employee Handbook-CA.20" (taken on Sept. 16, 2020). (Cf. *Trinity*, *supra*, 78 Cal.App.5th at p. 1118 [autogenerated acknowledgement form containing employee's name and identification number].) Exhibits E, G, I, and K of Bennett's declaration were "**Questions, Answers, and Results [¶] Centre for Neuro Skills**" for these tests, respectively, all of which showed (1) a question asking the tester to acknowledge the handbook's contents included the arbitration agreement and agree to submit employment-related disputes to binding arbitration; and (2) the correct answer to said question was "Yes" (for the 2016 version) or "True" (for the 2018, 2019, and 2020 versions). (Cf. *Fabian*, *supra*, 42 Cal.App.5th at p. 1065 [signature box at end of contract contained plaintiff's "printed electronic signature," date, 15-digit alphanumeric character, and words "DocuSigned by" and "Identity Verification Code: ID Verification Complete"].)

We find the foregoing evidence was "not ' " 'of such a character and weight as to leave no room for a judicial determination' " ' that [defendants] failed to establish that [Herrera] electronically signed the Contract." (*Fabian*, *supra*, 42 Cal.App.5th at p. 1068.) Bennett's declaration did not detail how the transcript and tests were "generated, stored or retrieved, including who had access to the records and whether they

21.

could be manually created or altered." (*Trinity*, *supra*, 78 Cal.App.5th at p. 1125.) "[T]here was no testimony that [Herrera]'s own actions were the exclusive way [the transcript] bearing her credentials could be created." (*Ibid.*; see *Fabian*, *supra*, at p. 1070 ["[Declarant] did not suggest how the electronic signature could have only been placed on the Contract by [the plaintiff]."].) Hence, a court could find "a critical gap in the evidence supporting the petition" (*Ruiz*, *supra*, 232 Cal.App.4th at p. 844) and we cannot conclude the court's order denying defendants' motion to compel arbitration was erroneous as a matter of law.

## DISPOSITION

The order is affirmed. Costs on appeal are awarded to plaintiff and respondent Priscilla Herrera.


DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.